Filed 11/5/14  P. v. Fields CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ELIJAH RASEAN FIELDS et al.,<br><br>Defendants and Appellants. | C068047<br><br>(Super. Ct. No. 09F04709) |

A Halloween costume party went horribly wrong, leaving one partygoer dead and several others wounded.  An information charged defendants Elijah Rasean Fields and Corey Andre Carmicle each with one count of murder and four counts of attempted murder.  The information also alleged defendants committed the crimes for the benefit of a criminal street gang.  (Pen. Code, §§ 187, 664/187, 186.22, subd. (b)(1).)[1]  A jury found

---

[1]  All further statutory references are to the Penal Code unless otherwise designated.

1

both defendants guilty of murder and three counts of attempted murder. The court sentenced Fields to 100 years to life in state prison, to be served consecutively to a determinate term of 45 years, and sentenced Carmicle to 100 years to life, to be served consecutively to a determinate term of 18 years four months.

Carmicle appeals, arguing instructional error, prosecutorial misconduct, and sufficiency of the evidence to prove the criminal street gang enhancements. Fields appeals, arguing instructional error, sentencing error, and cruel and unusual punishment, and joins in Carmicle's arguments regarding prosecutorial misconduct and sufficiency of the evidence to prove the criminal street gang enhancements. We shall remand to modify Fields's sentence to delete the gang enhancement and otherwise affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

On Halloween night in 2008 Patrick Razaghzadeh and his roommates hosted a costume party at their residence. One invitee brought a cousin who was a member of the Monk Mob gang, who in turn brought along some fellow gang members. Tensions erupted between the partygoers and the gang members. One gang member, Fields, fired Carmicle's handgun at Razaghzadeh and his friends. The shots killed Razaghzadeh and wounded several others.

An amended information charged both defendants in count one with the murder of Razaghzadeh, with enhancements for personal discharge of a firearm, resulting in great bodily injury and death (Fields and Carmicle); personal discharge of a firearm (Fields and Carmicle), personal firearm use (Fields and Carmicle); being armed with a firearm (Carmicle); and committing the crimes for the benefit of a criminal street gang (Fields and Carmicle). (§§ 187, subd. (a), 12022.53, subds. (b)-(e)(1), 12022.5, subd. (a)(1), 12022, subd. (a)(1), 186.22, subd. (b)(1).) In counts two through five the information charged both defendants with the attempted murders of Kyle Camp-Kelly, Justin Bailey, Spencer Bell, and Michael White and alleged, among other things, personal use of a

firearm (Fields and Carmicle). (§§ 664/187, subd. (a), 12022.5, subd. (a)(1), 12022.53, subds. (b), (e)(1).)

A jury trial followed. The following facts were introduced at trial.

**Prelude to the Party**

Razaghzadeh shared a house with Melissa Meyenberg, Bell, and Jeff Acosta in October 2008. Razaghzadeh and his girlfriend, Kristen Rau, planned a Halloween party, and each roommate invited friends. Prior to the party, Rau e-mailed friends about their costumes.

A few days before Halloween, Camp-Kelly invited his cousin, Charles Ferrell, to a Halloween party at Camp-Kelly's house. However, on Halloween night the party moved to Razaghzadeh's house. Camp-Kelly, a good friend of Razaghzadeh, drove to the house with several friends the evening of the party.

**Defendants Learn of the Party**

On Halloween evening, Willie Harris picked up Carmicle and Fields and drove them to a party in North Highlands. At that party, Carmicle sold some Ecstasy pills to Harris. Harris, Carmicle, and Fields drove to Carlos Allen's house, where Carmicle received a phone call from Ferrell. Ferrell told them his cousin was having a party and the group decided to attend.

The group met up with Ferrell, Willie Toliver, and "a Mexican guy" named Chris. The group drove to Omega Court, across from a liquor store, where they met some other people, smoked marijuana, and Harris, Carmicle, and Jarrell Triplett took Ecstasy. Ferrell wore a white Rice Krispies sweatshirt; the others wore hoodies or pea coats.

Ferrell went into the liquor store and bought two fifths of Hennessy. He brought the Hennessy to the passenger side of Harris's van. Carmicle, in the front passenger seat, showed Ferrell a gun, a gray semiautomatic. Ferrell told Carmicle he should probably not bring the gun to his cousin's party.

3

Carmicle, Fields, Triplett, "Jay," and Allen rode in the van, following a car containing Ferrell, Toliver, Harris, and Chris, to Camp-Kelly's party. Camp-Kelly called Ferrell and told him the party had moved. Ferrell called the van and told them of the change in plans.

As they drove, Carmicle drew his gun and told Harris, "I'm gonna do a Mac Dre." Harris interpreted this as Carmicle's intention to shoot the gun off in the car while driving on the freeway. Harris became angry and asked Carmicle why he brought the gun. Carmicle said the gun was for protection. Harris did not think the other passengers saw the gun. Carmicle repeatedly pointed out that Halloween was the Monk Mob's anniversary.

As they approached Razaghzadeh's house, everyone except Jay yelled "Monk Mob" and "the Mob is here" from the van's open sliding door. After Harris parked the van, the group joined Ferrell, Toliver, and Chris. Everyone walked to the house.

**Defendants Join the Party**

That evening, Daniel Buckner, Jason Boggs, Bradley Chastain, Matt Chastain, Bailey, and Matt Eddie, wearing costumes, attended the party. They arrived to find approximately 30 people already there. A group played "beer pong" in the garage; others socialized and commented on one another's costumes. Buckner saw Razaghzadeh, who appeared in good spirits.

Razaghzadeh's friend, Chris Buttler, was smoking out front and saw the group arrive. Since none of the group wore a costume, Buttler asked them whom they knew at the party. Ferrell said he was Camp-Kelly's cousin. Camp-Kelly came outside and vouched for the group. Although Camp-Kelly was surprised at the size of the group accompanying Ferrell, he believed everyone would get along.

Jessica Romo, Acosta's girlfriend, testified that prior to the group's arrival, there were only a few African American people at the party. The arrival of a large group of African Americans, not in costume and talking about "Crips and pills," startled the

4

partygoers.  Romo became very upset when one of the group placed his hand on her bottom.  Romo heard one of the newcomers say "Crip something" and "pills," and saw one of them make a hand sign.  One of the group offered to sell Ecstasy and pills.

Buckner saw the group walk out to the side yard where he and Chastain stood smoking.  The group did not seem hostile, but neither did they seem friendly.  Buckner identified Carmicle as one of the members of the group.

The group stayed together in the side yard and drank Hennessy.  Harris testified that as a song played, Carmicle, Fields, Triplett, and Allen threw up their hands and made Mob and Crip hand signs as they said, "Mob."  Harris also was "throwing up Highlands"; he demonstrated in court the hand sign he made.  Although he was not a gang member, Harris made the Highlands hand sign because he was from North Highlands.

**Tensions Erupt**

A large man in costume walked up to the group and offered his Hennessy bottle to Carmicle.  Carmicle declined and the man said, "Just hit the bottle."  Carmicle became angry and told the man, "Fuck you, nigga.  It's the Mob."

Buckner heard someone from the group say, "You don't know where I'm from." Ferrell later told detectives Carmicle started "banging.  He said this is Monk Mob.  Mob brought its own bottle."  According to Ferrell, Carmicle often was loud, and his confrontational behavior was not unusual.

Harris stepped in between Carmicle and the large costumed man and said, "Hold on, bro'.  He said he don't want to hit your bottle."  The other man called Harris a bitch and Harris "kind of lost it."  To break the tension, Ferrell and Triplett took a drink from the man's bottle.

Razaghzadeh's housemate, Meyenberg, came out of the house and said her camera was missing from the garage.  She went to find Razaghzadeh because she did not know the new arrivals and did not feel safe.  Meyenberg told Razaghzadeh she wanted the

5

group to leave, and if he did not say something to them, she would. He suggested they both approach the group and say something.

Meyenberg asked Ferrell if his friends had taken her camera. She politely asked some of the group to leave, but they said they had every right to be at the party and called her a racist. Ferrell was upset that Meyenberg kept asking about her missing camera. The camera later turned up in the possession of a friend Ferrell had invited to the party.

Razaghzadeh and housemate Bell confronted other members of the group. Bell asked the group, which included Harris, Ferrell, Allen, Carmicle, Fields, Triplett, and Jay, to either don a costume or leave the party.

Camp-Kelly approached and told Bell, "[T]hey are cool, they are cool, it's all good, they are all right." Bell disagreed, saying, "[N]o, they are not cool. You need to tell them to leave. This is my house."

**Escalation and Explosion**

Bell yelled at the group, telling them to "get the 'F' out" of his house. Ferrell's group responded, "[F]uck that" and "we ain't leaving." Carmicle said, "[W]e ain't going nowhere. [¶] The Mob is here."

Someone called Razaghzadeh a "faggot" and other names, causing Bell to yell louder. Camp-Kelly held Razaghzadeh back and attempted to calm him. White grabbed Bell and told him to calm down. Bell asked Camp-Kelly to tell the group to leave. Buckner saw people in the group making hand signals that looked like an "M."

Camp-Kelly told Razaghzadeh that Robert Ferrell, Charles Ferrell's cousin who was also at the party, was family, was cool, and that she would vouch for him. Razaghzadeh, speaking to the Ferrells, apologized to the group, saying, "I kind of disrespected y'all, you know; just have a good time." However, Camp-Kelly did not believe Carmicle accepted the apology. Camp-Kelly noticed Carmicle's eyes were red and he seemed to be on drugs.

6

Razaghzadeh shook hands with Jay and Harris. When he extended his hand to Fields, Fields responded with either, "You would try to shake my hand, bitch" or "Yeah, you should apologize, you punk bitch." Harris heard someone say, "Fuck that, nigga" and "Mob." The only voice Harris heard distinctly was Carmicle's.

After the verbal assault, Razaghzadeh told the group, "[T]his is my house. These are my friends" and "I'm not scared of you." Razaghzadeh and about seven of his friends began to "half circl[e]" the other group. Razaghzadeh bolted and ran around everyone so no one could catch or stop him. Allen punched him, knocking him into a barbecue grill.

**The Shooting**

Harris saw Carmicle pass his gun to Fields and say, "Here, I can't hold this. I'm too fucked up to hold this." It was the same gun Carmicle had shown Harris earlier. Razaghzadeh got up and started to run at the group, and Fields began firing. Five bullets hit Razaghzadeh, two hit Camp-Kelly, two hit Bell, one hit Bailey, and one hit White.

The party fell silent as partygoers dropped to the ground; then some people got up and began screaming. Buckner got up and looked in the direction of the shots. He saw Camp-Kelly on the ground screaming that he had been shot. Buckner helped Camp-Kelly, who had been shot "in the back and out the stomach," out to the front yard. Buckner returned to the backyard, and he and someone named Ryan tried to perform CPR on Razaghzadeh. Buckner checked for a pulse but could not find one.

**The Aftermath**

Buckner saw people running through the garage and the house in an effort to get away. Harris ran to his van, and Fields, Triplett, and Allen jumped in. Harris started the van and drove off, then went back and picked up Jay and left again. Fields said, "I think I just killed my nigga's cousin, I think I just killed my nigga's cousin."

As Harris drove away, several police cars drove toward them. Harris turned down a side street and began driving wildly. He told everyone to get out of the van.

Fields gave the gun to Allen and got out of the van. Harris told Allen to put the gun in a sliding drawer under the front passenger seat. Harris and Allen later met Carmicle and a companion. Allen gave Carmicle the gun.

Later that morning, Carmicle came to Harris's mother's house. Harris described Carmicle as looking "real tore back." He was not sure if Carmicle was drunk or high. Carmicle showed Harris a .44-caliber revolver and said, "Look, I already got another gun." About two weeks later, the duo left the state.

**The Injuries**

Camp-Kelly remained in the hospital for two and a half weeks. At trial he still had bullet fragments in his lower spine and nerve damage to his left foot and leg.

Bell was shot in the left forearm and right thigh. He suffered a broken radius bone, and damaged nerves and tendons. Bell underwent three surgeries and a year of physical therapy.

A bullet grazed White's arm. Bailey was shot in the left leg, resulting in a fractured tibia. He remained in a cast for three months and lost flexibility in his leg. Complications from blood clots led to a further hospitalization.

**Razaghzadeh's Autopsy**

A forensic pathologist testified about the results of the autopsy on Razaghzadeh. One bullet entered Razaghzadeh's forehead, another struck his right abdomen, two hit his left thigh, and a bullet grazed his right thigh. The pathologist stated Razaghzadeh died from gunshot wounds to his head, abdomen, and left thigh.

**The Investigation**

Just after midnight on November 1, 2008, officers were dispatched to the scene of an assault with a deadly weapon. At the scene, officers found chaos. They ordered people to lie down in order to ascertain whether they were suspects, witnesses, or victims. More than 30 people were at the scene; they were angry and hostile. Some people were in costume, and officers found bottles of alcohol and beer cans.

Paramedics pronounced Razaghzadeh dead. Officers recovered two nine-millimeter shell casings in the yard. Numerous other casings were later found near the first two. A bullet was found underneath Razaghzadeh's body.

Officers obtained a wiretap order enabling them to monitor the telephone conversations of targeted individuals. Detectives conducted interviews in order to generate telephone conversations between the people being monitored. A May 2009 three-way call between Triplett, Carmicle, and Fields was played for the jury. During the call, Triplett told Carmicle that Allen had been talking about Carmicle's "snitchin' " on Allen.

Subsequently, officers arrested Ferrell, Carmicle, Fields, Toliver, Allen, Triplett, and Harris for the murder of Razaghzadeh and the attempted murder of the others. Several of those arrested testified at trial.

**Ferrell's Testimony**

Ferrell became part of the Monk Mob in high school. The Monk Mob was formed on Halloween, and Toliver brought Ferrell into the gang.

After Ferrell joined the Monk Mob, the group met to discuss how to get money and to formulate gang rules. At one meeting, the members discussed selling drugs, pimping prostitutes, committing robberies, and other illegal activities as ways to get money. The Monk Mob sold Ecstasy pills and marijuana. Members also discussed concealing their identities by hiding their faces while engaged in illegal activity.

At a gang meeting, members chose nicknames to conceal their identities while engaged in illegal activities. Ferrell testified that both Fields, nicknamed Famous, and Carmicle, nicknamed Dice, were members of the Monk Mob. Other members were Triplett, nicknamed Poopa; Allen, nicknamed Cla; and Harris, nicknamed Calvo.

The group was previously known as Monk L, which stood for "Money Orientated Niggas Killing Legends." One of the gang rules was that no one fought by himself. Monk Mob is a close-knit family, and there is strength in numbers. Members also

9

understood that when they went out as a group, one member would be armed with a gun for protection from outsiders.

Beast Mob is Monk Mob's main rival gang. When the two gangs met, trouble would erupt. Shootings and fights broke out between the two gangs. Ferrell testified Monk Mob members carried guns to parties, unless it was a family party.

After proving less than cooperative in interviews with detectives, Ferrell was arrested as an accomplice. Following many months in jail, Ferrell agreed to cooperate with the district attorney. The charges against him were dropped.

**Harris's Testimony**

Harris is Carmicle's cousin and has known him all his life. Around the time of the murder, Harris and Carmicle saw each other four or five times a week.

Initially, Harris lied about his part in the shooting. Harris faced pressure not to talk and to "[s]tay true to the 'hood." His family cut him off after he agreed to testify.

The day before Halloween, Harris drove Carmicle and Fields in his van to Willie Toliver's apartment. Harris waited in the van while Carmicle went to the apartment to pick up marijuana from Toliver. After Carmicle returned, they were driving out of the apartment complex as Lorenzo Toliver was driving in. The two vehicles stopped and Lorenzo Toliver started talking to Carmicle. Carmicle pulled out a nine-millimeter handgun. Carmicle told Lorenzo Toliver he had just bought the gun.

During cross-examination, Harris admitted he had lied at the preliminary hearing. At the hearing, Harris testified Fields held a gun to his head after they left the party to make sure he picked up Jay.

Following the shooting, Harris was arrested and charged with murder and four counts of attempted murder. Harris entered into an agreement to cooperate with the district attorney, and the charges were dismissed.

**Lorenzo Toliver's Testimony**

Willie Toliver's brother Lorenzo Toliver testified reluctantly after being jailed for failing to respond to a subpoena. The day before Halloween 2008 Lorenzo saw Carmicle and Harris together in a van. He denied seeing Carmicle with a nine-millimeter pistol. Previously, Lorenzo told detectives he had seen Carmicle with a gun in order to regain custody of his child.

In addition, Lorenzo denied that following the shooting Carmicle told him: "Niggas rushed up on us, so you know how the mob get down, nigga. We don't be playing, and shit, you know. One of the little homies -- he didn't say who -- but he said one of the little homies pulled out a gun and started shooting." Although he gave the statement to a detective, Lorenzo retracted most of it. Around the time of the shooting, Lorenzo spent time with Carmicle, who would have his gun out "[w]hen we all got together in a crowd."

**Antonio Hughes's Testimony**

Antonio Hughes knew Fields through Fields's mother, Rachel Jordan. In April 2009 Hughes spoke with Jordan about the shooting. Jordan told Hughes that Fields had admitted his involvement. According to Jordan, Fields was the shooter. Hughes believed his testimony put him in danger.

During cross-examination, Hughes testified that Jordan told him there was a guy at the shooting who had been "fucked up on E pills" to the point where he had to give his gun to Fields to hold.

**Gang Expert Testimony**

Detective John Sydow testified as an expert on criminal street gangs. Sydow first became aware of the Monk Mob in 2006 or 2007. Willie Toliver formed the gang on Halloween in 1999. The predominant gang in the area is the North Highlands Gangsta Crips (NHGC). The Monk Mob is not an offshoot of the Crips but is under the control of NHGC.

11

Sydow estimated that the Monk Mob had between 25 and 30 members in late 2008. The gang's primary activities in that time period consisted of strong-arm robberies, armed robberies, selling Ecstasy and marijuana, and burglaries. The Monk Mob also took part in pimping, assaults with firearms, and drive-by shootings.

In Sydow's opinion, Fields belonged to the Monk Mob at the time of the shooting. Fields had been identified as a member of the gang by fellow members Willie Toliver, Allen, Ferrell, and Triplett.

Fields posted a short video on his Myspace social networking page. In the video, Fields made the Monk Mob hand sign and talked about being from "the mob." Fields stated he was from Maney Mob, a gang which Sydow explained had been absorbed into the Monk Mob. Other postings on Fields's Myspace page confirmed his membership in the Monk Mob.

The parties stipulated that photos of Fields's tattoos were an accurate representation of the tattoos on Fields. Fields had a tattoo stating "Death B4 Dishonor." Willie Toliver and Carmicle also sported that tattoo.

According to Sydow, Carmicle also belonged to the Monk Mob. Sydow based his opinion on crime reports, information from law enforcement, Carmicle's own statements, and postings on Carmicle's Myspace page.

Willie Tolliver, Ferrell, Allen, and Triplett all identified Carmicle as a member of the Monk Mob. The wiretaps revealed Carmicle said he would not snitch because he was not going to be "put[ting] that on the Mob." In 2007 Carmicle admitted to officers he belonged to the Monk Mob. Carmicle's tattoo collection included "Monk Mob," "Solid Nigga," and "RIP Taz," referring to a Monk Mob member who had been killed.

Sydow explained that gangs place the utmost importance on the concept of respect. Gang members derive respect by inspiring fear in members of the community or in rival gangs. According to Sydow, the Monk Mob's criminal activities–drug dealing, robberies, and drive-by shootings–were aimed at provoking just such fear.

12

An act of disrespect toward a gang member requires an immediate response of overwhelming force to counter the disrespect. Sydow testified that when a gang member says he is "putting in work" for the gang, it means engaging in activities to make the gang look better and to diminish its rivals. Gangs do not tolerate members "snitching," and in extreme cases the snitch may be killed.

Testifying in response to a hypothetical, Sydow stated that when partygoers asked Monk Mob members to leave a party, the gang would consider that a form of disrespect for the gang. A shooting under those circumstances would send out a warning and would benefit the gang by instilling fear in nongang members. By firing into the partygoers, the gang member immediately responded to the lack of respect. Sydow was familiar with other cases in which a fistfight degenerated into a shooting when gang members were involved.

**Carmicle's Contact with Law Enforcement**

On December 31, 2007, officers conducted a traffic stop involving Carmicle. Officers found a nine-millimeter handgun on the floor of Carmicle's car. Carmicle had a blue bandana hanging out of his pants pocket. Sydow testified the bandana indicated Carmicle's allegiance with the Crip gang. Carmicle admitted being a member of the Monk Mob.

In April, following the shooting, officers conducted a warrant search of a motel room inhabited by Carmicle and three others. When an officer picked up Carmicle's pants, a nine-millimeter magazine fell out. The magazine contained nine rounds of hollow-point ammunition. Officers found a nine-millimeter handgun under the bed; the magazine fit the gun.

**Defense Case**

### *Allen's Testimony*

Carlos Allen, a lifelong friend of Fields, testified. Allen agreed to plead guilty to manslaughter in exchange for his testimony, and the district attorney dropped the gang and murder allegations.

Allen attended the Halloween party with the group including Fields and Carmicle. Fields and Carmicle took Ecstasy pills that night before leaving for the party. The group was going to have a good time, not look for trouble.

At the party, Willie Toliver rejected Razaghzadeh's attempt to shake hands. Allen testified Razaghzadeh "snapped," and his friends had to hold him back.

None of Allen's companions was squaring off to fight, but they were wary of Razaghzadeh. Razaghzadeh charged the group and Allen attempted to punch him. Razaghzadeh slipped, and Allen heard gunshots.

Allen did not see who did the shooting, but he saw a gun in Fields's hand. Allen ran to the van, which Harris drove with Triplett and Fields as passengers. Fields held the gun and said, "Fuck, I think I shot my partna's cousin." Fields appeared to be in shock.

Carmicle did not get into the van. Harris dropped off Fields and Triplett on the street in what appeared to be a wealthy area, then drove to Allen's house with Allen. Fields left the gun in the van and Harris said, "Fuck it . . . I'll take it."

During cross-examination, Allen conceded he had previously testified that the gun was visible on top of the van's console as they drove to the party. None of the group objected to the gun. Allen saw nothing unusual in bringing a gun to a party. On the way to the party, Carmicle did not want the gun because it was too big to conceal under his sweatshirt. Allen thought Fields took the gun because he could conceal it under his bulkier coat. Allen acknowledged that he and his group knew they should leave the party, but they were taking their time doing so.

*Fields's Testimony*

Fields testified in his own behalf. At the time of the shooting, Fields was a 17-year-old high school student who lived at home. He admitted he belonged to the Monk Mob but said the gang had only 10 to 12 members. According to Fields, he spent his time going to school, not selling drugs or committing robberies. His "death before dishonor" tattoo referred to his loyalty to his family.

On the way to the party, when Fields got into Harris's van he knew Carmicle had a gun. Carmicle had taken Ecstasy and Fields could see he was feeling the effects of the drug. Fields had also taken Ecstasy but was not yet feeling its impact. In the van, Carmicle passed the gun around to the others. To keep the others from playing with it, Fields put the gun in his coat pocket. The van followed the car carrying the rest of the group.

As the group entered the party, Fields was not concerned that he carried Carmicle's gun. No one already at the party seemed threatening. Fields went into the backyard and talked with Willie Toliver. Fields walked over to Allen and then a big guy started pushing Allen in the chest. Fields saw someone else rushing toward them and others running behind that person. He did not see Razaghzadeh fall.

Fields believed that Razaghzadeh and Razaghzadeh's friends intended to hurt him and his friends. In response, Fields pulled out the gun and, with his eyes closed, began firing. When he opened his eyes, Fields saw Ferrell's cousin fall to the ground.

Although Fields thought he had shot Ferrell's cousin, he was afraid, so he fled. As he got into the van, Fields thought, "What the fuck did I just do?" He held his head, rocking back and forth.

After Harris drove away from the party, Fields got out. He was still high and in a daze. Fields either handed the gun to Allen or put it on the backseat and left.

Fields did not know he had killed anyone until the next day. He never intended to kill anyone.

15

**Verdict and Sentencing**

The jury found Fields and Carmicle guilty of first degree murder, count one, and three counts of attempted murder, counts two, four, and five, and found the enhancements true. The jury was unable to reach a verdict on one count of attempted murder, count three.

The court sentenced Fields to 100 years to life in state prison, to be served consecutively to a determinate term of 45 years: on count one, 25 years to life, plus 25 years to life for personally discharging a firearm, causing death, and an additional 10 years for the gang enhancement; on count two, seven years, plus 25 years to life for personally discharging a firearm, causing great bodily injury, plus 10 years for the gang enhancement; on count four, two years four months, plus 25 years to life for personally discharging a firearm, causing great bodily injury, plus three years four months for the gang enhancement; on count five, two years four months, plus six years eight months for personally discharging a firearm, and an additional three years four months for the gang enhancement.

Carmicle brought a motion for a new trial, which the trial court denied. The court sentenced Carmicle to a term of 100 years to life in state prison, to be served consecutively to a determinate term of 18 years four months: four consecutive sentences of 25 years to life for the murder and each of the personal discharge of a firearm, causing death or great bodily injury, enhancements attached to counts one, two, and four; seven years for count two; two years four months each for counts four and five; and six years eight months for the personal discharge of a firearm enhancement in count five.

Both defendants filed timely notices of appeal.

## DISCUSSION

## I. INSTRUCTIONS ON ACCOMPLICE LIABILITY AND NATURAL AND PROBABLE CONSEQUENCES DOCTRINE

Carmicle contends the court's instructions on aiding and abetting misled jurors into believing that an aider and abettor's liability is coextensive with the perpetrator's. In addition, the instructions on the natural and probable consequences theory failed to require that, for first degree murder, not only murder, but deliberate and premeditated murder, must be found to be a natural and probable consequence of the target offense.

**Background**

*Instructions on Accomplice Liability*

The trial court instructed the jury on accomplice liability with CALCRIM No. 400: "A person may be guilty of a crime in two ways. One, he may have directly committed the crime. I will call that person the perpetrator. Two, he may have aided and abetted a perpetrator, who directly committed the crime.

"A person is guilty of a crime whether he committed it personally or aided and abetted the perpetrator.

"Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

In addition, the court instructed pursuant to CALCRIM No. 401, in relevant part: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"1. The perpetrator committed the crime;

"2. The defendant knew that the perpetrator intended to commit the crime;

"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"and

17

"4.  The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor."

***Instructions on Natural and Probable Consequences Theory***

The court instructed on the natural and probable consequences theory, in part, as follows:  "Before you may decide whether defendant Corey Carmicle is guilty of murder, attempted murder or the lesser included offenses under the natural and probable consequences theory, you must decide whether he is guilty of assault or assault by means of force likely to produce great bodily injury.

"To prove that defendant Carmicle is guilty of murder, attempted murder or the lesser included offenses under the natural and probable consequences theory, the People must prove that:

"1.  The defendant is guilty of assault or assault by means of force likely to produce great bodily injury as an aider and abettor;

"2.  During the commission of assault or assault by means of force likely to produce great bodily injury a coparticipant in that assault or assault by means of force likely to produce great bodily injury committed the crime of murder, attempted murder or the lesser included offenses;

"and

"3.  Under all of the circumstances, a reasonable person in defendant Carmicle's position would have known that the commission of the murder, attempted murder or the lesser included offenses was a natural and probable consequence of the commission of

18

the assault or assault by means of force likely to produce great bodily injury."
(CALCRIM No. 403.)

The court instructed the jury that to decide whether the crime of murder, attempted murder, or the lesser included offense was committed, the jury was to refer to the separate instruction given on those crimes. (CALCRIM No. 403.)

**Discussion**

*Accomplice Liability*

According to Carmicle, CALCRIM No. 401 informed the jury that the direct aider and abettor and the perpetrator must have both committed the same crime, not different crimes. Therefore, the instruction gave the jury the all-or-nothing choice of either convicting Carmicle as a direct aider and abettor of Field's crime or acquittal.

An aider and abettor may be convicted of a different offense than the perpetrator whom he aids and abets. Once it is proved that the principal has caused an *actus reus,* the liability of each of the secondary parties should be assessed according to his own *mens rea.* In other words, even though joint participants in a crime are tied to a single act, the individual levels of guilt of the joint participants are not tied to each other in any way. If their *mentes reae* are different, their independent levels of guilt will be different as well. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118-1119 (*McCoy*).) Under this reasoning, an aider and abettor may also be convicted of a lesser offense than the direct perpetrator. (*People v. Nero* (2010) 181 Cal.App.4th 504, 515-516 (*Nero*).)

In *Nero*, the appellate court considered jury instructions on aiding and abetting which provided that if the requirements of aiding and abetting were met, the aider and abettor was equally guilty as the perpetrator. The court held the instructions erroneously failed to inform the jury that the aider and abettor could be convicted of a lesser crime. (*Nero*, *supra*, 181 Cal.App.4th at pp. 510, 520.)

Carmicle concedes the instructions given in the present case did not include the explicit "equally guilty" language of the instructions found lacking in *Nero*, but argues

19

they conveyed the same concept. According to Carmicle, the language of CALCRIM No. 401 "leaves the distinct impression" that for an aider and abettor to be convicted of a crime, he must aid and abet the perpetrator's commission of the same crime. This leads to the reasonable likelihood the jury interpreted the instruction in "this erroneous manner."

However, in *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118-1119 (*Lopez*), we found a defendant's failure to request a modification of CALCRIM No. 400 forfeited any claim of error. Here, the record indicates defense counsel agreed to the jury instructions. The record contains no request by defense counsel for any additional instructions to clarify or amplify the given instructions.

Defendant responds by disagreeing with our decision in *Lopez* and citing *Nero*, *supra*, 181 Cal.App.4th 504, in which the court found the trial court erred in failing to modify the standard aiding and abetting instructions in the absence of a request. (*Id.* at pp. 517-518.) We find *Nero* distinguishable.

In *Nero*, a brother and sister were approached by the victim, who called the sister several vile names. The victim challenged the brother to a fight and hit the brother when he approached. The pair fought and the brother stabbed the victim. The brother stated he did not intend to kill the victim. The prosecution argued the sister gave her brother the knife. (*Nero*, *supra*, 181 Cal.App.4th at pp. 508, 510.) The jury, during deliberations, questioned the court as to whether it could convict the sister of a lesser degree of murder than her brother. In response, the court reread an instruction stating that each principal, including aiders and abettors, is " 'equally guilty.' " (*Id.* at pp. 511-512.)

The appellate court found the reasoning of *McCoy* applied and determined that an aider and abettor could be less culpable, or more culpable, than the perpetrator. (*Nero*, *supra*, 181 Cal.App.4th at pp. 517-518.) Therefore, the court erred in informing the jury that the aider and abettor was equally guilty when substantial evidence cast doubt upon the sister's intent to kill.

20

Here, the jury posed no such questions and the court did not require the jury to find Carmicle and Fields were equally guilty. Instead, the court instructed the jury that an actual perpetrator of a crime and a person who aids and abets that crime are deemed to be principals. The court explained that "[a] person is guilty of a crime" whether he committed it personally or aided and abetted the perpetrator. The court did not state that the aider and abettor was equally guilty of *the* crime, but only of *a* crime, allowing the jury to find Carmicle guilty of a lesser crime than Fields. In addition, the court informed the jury that Carmicle could not be an aider and abettor unless he knew the perpetrator intended to commit the crime and Carmicle intended to aid in the commission of the offense. Unlike the jury in *Nero*, the jury in the present case did not question the court's instructions on aider and abettor liability or request any clarification.

The court also instructed the jury on first and second degree murder, voluntary manslaughter, assault, attempted murder, and attempted voluntary manslaughter. Such instructions allowed the jury, if it found the evidence sufficient to prove that Carmicle committed a lesser crime, to convict him of a lesser crime. Given the court's instructions, a reasonable juror would have understood Carmicle could be convicted of a lesser offense than that of Fields if he lacked the intent to commit the crime or intent to aid and abet Fields's commission of the crime.

### *Natural and Probable Consequences*

We granted Carmicle's request for supplemental briefing following the Supreme Court's decision in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*). Carmicle contends we must reduce his first degree murder conviction to second degree murder because the trial court's instructions on the natural and probable consequences doctrine did not direct the jury to determine whether premeditated murder, not just murder, was a natural and probable consequence of assault. According to Carmicle, *Chiu* supports his contention.

Section 31, which governs aider and abettor liability, provides: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and

21

whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." An aider and abettor is one who acts with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)

A person who knowingly aids and abets criminal conduct is guilty of not only the target offense, but also of any other crime the perpetrator actually commits that is the natural and probable consequence of the target offense. (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).) For example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, under the natural and probable consequence doctrine. (*McCoy*, *supra*, 25 Cal.4th at p. 1117.)

A nontarget offense is a natural and probable consequence of the target offense if, judged objectively, the nontarget offense was reasonably foreseeable. This judgment does not rely on whether the aider and abettor actually foresaw the nontarget offense. Instead, liability is determined by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted. The jury determines whether such reasonable foreseeability exists based on the facts before it. (*Medina*, *supra*, 46 Cal.4th at p. 920.)

In *Chiu*, the defendant was found guilty of first degree murder committed with deliberation and premeditation, under a natural and probable consequences theory of aiding and abetting. (*Chiu*, *supra*, 59 Cal.4th at p. 158.) The Supreme Court granted review to determine whether the trial court erred in instructing that an accomplice could be found guilty of first degree murder if murder, rather than premeditated murder, was a natural and probable consequence. The court found an accomplice cannot be found guilty of "first degree *premeditated* murder under the natural and probable consequences doctrine." (*Id*. at pp. 158-159.)

22

Previously, in *People v. Favor* (2012) 54 Cal.4th 868, the Supreme Court held an accomplice could be found guilty of attempted murder with premeditation where the jury instruction only referred to attempted murder, without reference to premeditation, as a natural and probable consequence. The *Chiu* court reasoned that premeditation for attempted murder was a penalty provision and not an element of the offense under section 664, subdivision (a). The *Chiu* court found *Favor* distinguishable in several respects: "the issue in the present case does not involve the determination of legislative intent as to whom a statute applies. Also, unlike *Favor*, which involved the determination of premeditation as a requirement for a statutory penalty provision, premeditation and deliberation as it relates to murder is an element of first degree murder. In reaching our result in *Favor*, we expressly distinguished the penalty provision at issue there from the substantive crime of first degree premeditated murder on the ground that the latter statute involved a different *degree* of the offense." (*Chiu*, *supra*, 59 Cal.4th at p. 163.)

Instead, the court considered the common law basis of the natural and probable consequences doctrine. The court reasoned: "In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing." (*Chiu*, *supra*, 59 Cal.4th at p. 165.) However, this public policy is less apparent when applied to premeditated murder: "First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.] Additionally, whether a direct perpetrator commits a

23

nontarget offense of murder with or without premeditation and deliberation has no effect on the resultant harm. The victim has been killed regardless of the perpetrator's premeditative mental state. Although we have stated that an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [citation], the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above stated public policy concern of deterrence." (*Id*. at p. 166.)

The court concluded that punishment for second degree murder was commensurate punishment for one who aids and abets a target crime that naturally and foreseeably results in a first degree premeditated murder. (*Chiu*, *supra*, 59 Cal.4th at p. 166.) However, the court also found an accomplice could still be found guilty of first degree murder for directly aiding and abetting a premeditated murder: "Because the mental state component–consisting of intent and knowledge–extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder." (*Id*. at p. 167.)

Because the court found a defendant could not be convicted of first degree premeditated murder under the natural and probable consequences doctrine, it had to determine whether giving the instructions allowing the jury to so convict the defendant was harmless error. (*Chiu*, *supra*, 59 Cal.4th at p. 167.) The court explained: "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.] Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder. [Citation.]" (*Ibid*.)

24

The court considered the record before it and found the jury might have based its first degree premeditated murder verdict on the natural and probable consequences theory. During trial, one of the jurors objected to the law on aiding and abetting. (*Chiu*, *supra*, 59 Cal.4th at p. 167.) The trial court questioned the juror, who stated she was bothered by the principle of aiding and abetting and putting the aider and abettor in the shoes of a perpetrator. The trial court removed the juror, replacing her with an alternate. The jury continued deliberating and found the defendant guilty of first degree premeditated murder. (*Id.* at p. 168.) The court concluded: "These events indicate that the jury may have been focusing on the natural and probable consequence theory of aiding and abetting and that the holdout juror prevented a unanimous verdict on first degree premeditated murder based on that theory. Thus, we cannot conclude beyond a reasonable doubt that the jury ultimately based its first degree murder verdict on a different theory, i.e., the legally valid theory that defendant directly aided and abetted the murder." (*Ibid.*)

In the present case, the court instructed the jury on two theories under which Carmicle could be found guilty of murder: as an aider and abettor or under the natural and probable consequences doctrine. CALCRIM No. 403 informed the jury it could find Carmicle guilty of murder, attempted murder, or the lesser included offenses under the natural and probable consequences doctrine if the People proved all of the following: (1) he was guilty of assault or assault by means of force likely to produce great bodily injury as an aider and abettor; (2) during the commission of this crime, a coparticipant committed the crime of murder, attempted murder, or the lesser included offenses; and (3) under all the circumstances, a reasonable person in Carmicle's position would have known that the commission of the murder, attempted murder, or lesser included offenses was a natural and probable consequence of the commission of the assault or assault by means of force likely to produce great bodily injury. CALCRIM No. 403 informed the jury: "To decide whether [the] crime of murder, attempted murder or the lesser included

25

offenses was committed, please refer to the separate instructions that I will give you on those crimes."

The jury was instructed on homicide. Regarding express or implied malice and murder, the court instructed that defendant acted with express malice if he unlawfully intended to kill. Defendant acted with implied malice if he intentionally committed an act; the natural and probable consequences of the act were dangerous to human life; at the time he acted he knew the act was dangerous; and he deliberately acted with conscious disregard for human life.

Carmicle argues *Chiu* mandates reversal of his conviction of first degree murder. The People contend any error in the trial court's instructions on the natural and probable consequences doctrine was harmless beyond a reasonable doubt.

Carmicle contends, "Nothing in the record supports a finding beyond a reasonable doubt that [Carmicle] was properly convicted of aiding and abetting under the legally valid theory of direct aiding and abetting." We disagree.

At trial, the evidence established that Carmicle, along with Fields, instigated the fight that broke out among the gang members and the hosts of the Halloween party. On the way to the party, Carmicle told Harris that he brought a gun for protection. Arriving uninvited at the party, Carmicle became angry with a costumed partygoer who wanted him to drink some Hennessy. Carmicle told the man, "Fuck you, nigga. It's the Mob." Ferrell told detectives that Carmicle then started "banging. He said this is Monk Mob. Mob brought its own bottle." According to Ferrell, Carmicle's loud, confrontational behavior was not unusual.

When his group was asked to leave, Carmicle said, "[W]e ain't going nowhere. [¶] The Mob is here." After Razaghzadeh apologized to the group, Carmicle did not accept the apology. His eyes were red and he seemed to be on drugs. Razaghzadeh tried to shake Fields's hand and Fields responded with either, "You would try to shake my

hand, bitch" or "Yeah, you should apologize, you punk bitch." Harris heard someone say, "Fuck that, nigga" and "Mob." The only voice Harris recognized was Carmicle's.

Razaghzadeh then told the group, "[T]his is my house. These are my friends" and "I'm not scared of you." After Razaghzadeh and about seven of his friends began to circle Carmicle and Fields's group, Razaghzadeh ran around everyone so they could not catch or stop him. Allen punched him, knocking him into the barbecue grill.

Harris saw Carmicle pass his gun to Fields. Carmicle told Fields: "Here, I can't hold this. I'm too fucked up to hold this." Fields began firing, hitting Razaghzadeh, Camp-Kelly, Bell, Bailey, and White.

Carmicle brought the gun to the party, exacerbated the confrontation between the two groups, and handed the gun to Fields, enabling him to shoot five people, one fatally. The prosecutor, during closing argument, noted: "And instigating. When we talk about the gangbanging and when we talk about that, we ain't going nowhere, when we talk about everything [Carmicle] is doing, knowing that that gun is present, knowing at that point that Elijah Fields has that gun, he is clearly and absolutely instigating. . . . [Carmicle] is the primary instigator in this case. He is the one that brings the gun to the party, and that is the reason that we are all here today."

Carmicle and Fields formed a lethal duo. As the prosecutor argued: "These guys have chosen a lifestyle that glorifies violence, that glorifies murder. . . . It's a lifestyle choice in which as you walk around with that gun in your pants, you are premeditating the concept of murder because that gun is for a human being."

In addition to finding Carmicle guilty of murder, the jury also found him guilty of three counts of attempted murder. To find him guilty of attempted murder, the jury had to find Carmicle intended to kill and possessed the requisite mens rea for first degree murder. The prosecutor argued: "[J]ust like first degree murder, the type of malice that we talk about in attempted murder is always express malice. So unlike an actual murder where implied malice is sufficient for malice aforethought, with attempted murder there

27

has to be this concept of express malice or an actual intent to kill." Given the evidence and the verdicts rendered, we find beyond a reasonable doubt that the jury relied on the aiding and abetting theory of liability, not the natural and probable consequences doctrine, in finding Carmicle guilty of first degree murder.[2] Therefore, any instructional error on the natural and probable consequences theory of liability was harmless.

## II. INVOLUNTARY MANSLAUGHTER INSTRUCTION: SUDDEN QUARREL OR HEAT OF PASSION

Carmicle argues the court erred in failing to instruct sua sponte on voluntary manslaughter based on sudden quarrel or heat of passion. Carmicle argues substantial evidence supports a finding that when he aided and abetted Fields, he did so under the influence of sudden quarrel or heat of passion in response to legally adequate provocation. In the alternative, Carmicle asserts that under the natural and probable consequences theory the crimes of voluntary and attempted voluntary manslaughter based on sudden quarrel or heat of passion, not murder or attempted murder, were the

---

[2] During deliberations, the jury sent the court a note asking for clarification regarding aiding and abetting, "especially with regards to knowledge of intent to commit crime." Carmicle contends, "Because the concept of reasonable foreseeability requires determination of what a reasonable person in the defendant's position would have *known* was likely to happen as a consequence of the target offense, the note supports that the jurors were troubled by the concept and may have been focusing on the natural and probable consequences theory." Therefore, as in *Chiu*, the jurors' note prevents a finding of harmless error. We disagree. Under the aider and abettor theory of liability, the jury had to find Carmicle acted with knowledge of Fields's criminal purpose and "with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*Beeman*, *supra*, 35 Cal.3d at p. 560.) The jury's note requested clarification of the knowledge of intent under the aiding and abetting theory; in *Chiu*, the jury's note and the trial court's questioning revealed the jury was focusing on the natural and probable consequences theory, and the holdout juror prevented a unanimous verdict on that theory. We do not find the jury's note in the present case precludes a finding of harmless error.

reasonable foreseeable consequence of the target crime of assault, which Carmicle directly aided and abetted.

A trial court has a duty, even in the absence of a request, to instruct on general principles of law relevant to the issues raised by the evidence and necessary to the jury's understanding of the case. Included in this duty is an obligation to instruct on lesser included offenses when the evidence raises a question as to whether the greater, charged crime has been proven and there is substantial evidence that only a lesser included crime was committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*); *People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

**Sudden Quarrel/Heat of Passion**

Carmicle argues the court erred in not instructing on voluntary manslaughter based upon sudden quarrel or heat of passion. An intentional unlawful homicide is a voluntary manslaughter stemming from a sudden quarrel or heat of passion if the defendant acted through strong passion aroused by a provocation sufficient to cause an ordinary person to act without due deliberation and reflection. (*Breverman*, *supra*, 19 Cal.4th at p. 163.)

Manslaughter based upon a sudden quarrel or heat of passion has an objective and a subjective component. Under the subjective component, the defendant must actually kill in the heat of passion. Under the objective component, the circumstances giving rise to the act must be objectively sufficient to provoke an ordinarily reasonable person to act rashly and without deliberation. (*People v. Enraca* (2012) 53 Cal.4th 735, 759.)

No specific type of provocation is necessary and the passion can be any violent, intense, or high-wrought emotion other than revenge. The defendant cannot have been the source of the provocation. The victim must initiate the provocation that incites the defendant to kill in the heat of passion. (*Breverman*, *supra*, 19 Cal.4th at p. 163; *People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

To establish the objective component, Carmicle carefully shapes the facts to portray himself as simply responding to great provocation during the party. He argues

29

merely being an armed gang member at a party cannot rule out a heat of passion or sudden quarrel instruction. According to Carmicle, Ferrell testified that a Monk Mob member was typically armed for protection when the group went out, which is "a legitimate purpose harbored by many lawful gun owners in society." Instead, Carmicle argues, his liability rests on his words and acts at the party.

Under Carmicle's scenario, when he engaged in the acts the prosecution relied on to prove aiding and abetting, uttering gang phrases and passing Fields the gun, "he did so in response to conduct by Razaghzadeh and his associates which could have caused an ordinary person of average disposition to act rashly, out of passion rather than reason." In support, Carmicle notes his group was invited to the party and kept to itself until challenged by a drunken guest. They were falsely accused of stealing a camera and singled out for not wearing costumes. They were ordered to leave, but not by their host, and they stood their ground. Razaghzadeh became aggressive, and Carmicle mentioned Monk Mob and told him they were staying. This provides substantial evidence to support the objective component of voluntary manslaughter based on sudden quarrel or heat of passion.

As for the subjective component, Carmicle, who did not testify in his own defense, contends circumstantial evidence shows he acted out of passion rather than judgment. Carmicle notes that Camp-Kelly testified Carmicle had a strange, evil look when Razaghzadeh apologized. Carmicle also points to Ferrell's testimony that by the time of the apology the group felt so disrespected they could not accept the apology, and Carmicle was among the loudest in opposing the other guests.

We are not convinced. Nothing in the events leading up to the shooting would lead a reasonable juror to conclude Carmicle acted during a sudden quarrel or in the heat of passion.

Carmicle and his fellow Monk Mob members attended the party with Ferrell, who had been invited by Camp-Kelly. Carmicle supplied the gun later used in the murder.

30

Some time after they arrived, a large, drunk man tried to force drinks on Carmicle and his group, and Meyenberg accused the group of stealing her camera. Later, Razaghzadeh and his friends asked Carmicle's group to leave. None of these incidents, even in the aggregate, amounted to provocation sufficient to warrant a sudden quarrel or heat of passion instruction.

To the contrary, amid simmering tensions, Razaghzadeh approached Carmicle's group and apologized. Razaghzadeh shook hands with several members of the group, at which point several members of the group, including Carmicle, made derogatory remarks about Razaghzadeh and yelled "Mob." After being called a "punk bitch," Razaghzadeh became upset and charged at the group despite the efforts of his friends to restrain him. At this point Fields shot Razaghzadeh five times with Carmicle's gun.

Nothing in this sequence of events supports Carmicle's claim that when he uttered gang phrases and passed Fields the gun, "he did so in response to conduct by Razaghzadeh and his associates which could have caused an ordinary person of average disposition to act rashly, out of passion rather than reason." The incidents leading up to the murder took place over time during the party. It was not the steady drumbeat of confrontation leading to an explosion of violence. Instead, it was a sequence of discrete events that fostered tension among gang members at a party filled with nongang members.

These tensions escalated when the party givers asked Carmicle and his group to leave. However, in response to the heightened atmosphere, Razaghzadeh attempted to defuse the situation by both apologizing and shaking hands with the group. His efforts were met with taunts and threats and, ultimately, five bullets. A defendant may not provoke a fight, become the aggressor, and, after failing to attempt to withdraw from the altercation, kill the victim and expect to reduce the crime to manslaughter by merely asserting the defendant was motivated by a sudden quarrel or the heat of passion. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 83.)

31

Carmicle characterizes Razaghzadeh's actions as "efforts to apologize" and asserts: "At best, the apology may have smoothed things over, but only momentarily. [Citations.] The confrontations just kept coming." This mischaracterizes the evidence. Razaghzadeh approached Carmicle's group and said "I kind of disrespected y'all, you know; just have a good time." Camp-Kelly, who had invited the group, testified Carmicle appeared to reject the apology. The confrontations that "just kept coming" consisted of Carmicle's group's verbally ridiculing and taunting Razaghzadeh as he attempted to shake hands with them. When an infuriated Razaghzadeh ran at the group, bullets stopped him. Nothing in this scenario supports Carmicle's contention that substantial evidence satisfies the objective component of voluntary and attempted manslaughter based on sudden quarrel or heat of passion.[3]

## III. BRANDISHING

Carmicle also faults the trial court for failing to instruct on misdemeanor manslaughter, based on brandishing, as a lesser included offense to murder. Under Carmicle's reasoning, rational jurors could have found that misdemeanor manslaughter, not murder, was the reasonably foreseeable consequence of a fistfight, the target crime that Carmicle aided and abetted.

Section 417, subdivision (a)(2) defines the offense of brandishing: "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel is punishable as follows:

"(A) If the violation occurs in a public place and the firearm is a pistol, revolver, or other firearm capable of being concealed upon the person, by imprisonment in a

---

[3] Since we find Carmicle cannot meet the objective component, we need not address Carmicle's arguments regarding the subjective component.

32

county jail for not less than three months and not more than one year, by a fine not to exceed one thousand dollars ($1,000), or by both that fine and imprisonment.

"(B) In all cases other than that set forth in subparagraph (A), a misdemeanor, punishable by imprisonment in a county jail for not less than three months."

Carmicle argues reasonable jurors could have found that misdemeanor manslaughter, not murder, was the reasonably foreseeable consequence of a fistfight, the target crime he aided and abetted even though Fields committed homicide. Under Carmicle's reasoning, jurors could have determined that the reasonably foreseeable consequence of the fistfight Carmicle encouraged was involuntary manslaughter committed during the misdemeanor of brandishing. In Carmicle's rendering, the two groups angrily pushed and shoved one another, yelled epithets, and threw punches. In this atmosphere it was reasonably foreseeable that Fields might have the gun "and exhibit it in a rude, angry or threatening manner, resulting in death."

The evidence does not support Carmicle's argument. No testimony established that Fields drew or exhibited Carmicle's gun "in a rude, angry or threatening manner." Instead, witnesses described Fields's pointing the gun, pulling the trigger, and firing shots into the crowd.

Carmicle argues that whether there is substantial evidence that Fields actually killed Razaghzadeh while brandishing a firearm is of no consequence. Since his claim is based on the natural and probable consequences theory, the question is whether there was substantial evidence that misdemeanor manslaughter based on brandishing was the reasonably foreseeable result of Carmicle's aiding and abetting the target crime. Carmicle contends the jury could have rationally found that the reasonably foreseeable result of the fight Carmicle encouraged was that Fields would negligently exhibit and discharge Carmicle's gun.

"However, the trial court need not instruct on a particular necessarily included offense if the evidence is such that the aider and abettor, if guilty at all, is guilty of

33

something beyond that lesser offense, i.e., if the evidence establishes that a greater offense was a reasonably foreseeable consequence of the criminal act originally contemplated, and no evidence suggests otherwise." (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1578.) Here, no evidence suggests that Carmicle was guilty of the lesser offense of brandishing.

## IV. PROSECUTORIAL MISCONDUCT

According to Carmicle, in an argument joined by Fields, the prosecutor, during closing argument, peppered his comments with improper and inflammatory remarks about gangs, which inflamed the jurors' fears. These comments deprived defendants of a fair trial and influenced the jury's findings of deliberation and premeditation in an otherwise weak case. In the alternative, defendants argue trial counsel performed ineffectively in failing to object.

**Background**

During his initial remarks, the prosecutor stated: "When [gang members] take that gun in their waistband out into the community, it is for one purpose and one purpose only. No one is going hunting. Nobody is going target shooting that day. That gun is in that waistband because of this concept of premeditated murder. That gun is there for a purpose. That gun is meant for another human being.

"Remember the testimony we heard. It's typical. It's typical for Monk Mob to take a gun when we go out to a party. Why? Why is it typical? Because of that gang mindset, because that's what you do. Okay. It's tough to say that these guys, when they carried that gun as gang members out in the community, have not premeditated the concept of murder."

The prosecutor, during rebuttal, argued: "[H]ow can human beings act this way? How can human beings kill in cold blood? How can that occur? Okay.

"Both of these guys participate in a lifestyle that glorifies that. . . .

34

"These guys have chosen a lifestyle that glorifies violence, that glorifies murder. It's a lifestyle that leads you to take a gun to that party. . . . It's a lifestyle choice in which as you walk around with that gun in your pants, you are premeditating the concept of murder because that gun is for a human being. That gun is not to go hunting with. It is not for target practice. It is for a person. It is a lifestyle choice that puts you in the position where you can stand in that back yard and kill someone, that you can stand there and shoot a man five times in the back yard of his own home. It is that lifestyle choice that brings you there.

"I have not demonized either one of these guys. They have demonized themselves through the choices that they have made, through their associations, through the lifestyle that they lead, through their mentality."

**Discussion**

A prosecutor's conduct violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to deny the defendant due process. Prosecutorial conduct that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).)

As a general rule, a defendant must object to prosecutorial misconduct and request an admonishment when the misconduct occurs. (*Samayoa*, *supra*, 15 Cal.4th at p. 841.) The defendant's failure to object or request an admonition is excused if either it would be futile or an admonition would not have cured the harm caused by the misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

Defendants argue the prosecutor stated armed gang members premeditate murder because they have adopted a lifestyle that glorifies murder. These comments, defendants contend, "were so overbroad that they were speculative and hence irrational."

35

Defendants admit defense counsel failed to object, but argue this failure amounts to ineffective assistance of counsel. Therefore, we address the merits of defendants' prosecutorial misconduct claim.

The prosecutor, during closing argument, discussed and described the gang lifestyle and the use of guns. The prosecutor also gave the example of someone buying a rake in the fall to rake leaves. He provided the following analogy: "The gun to the gangster is like the rake is to me. When they take that gun in their waistband out into the community, it is for one purpose and one purpose only."

These comments, as well as those defendants find objectionable, provided the prosecution's gloss on the gang expert's testimony regarding the gang lifestyle. Detective Sydow testified that gang members frequently carry guns, resulting in shootings. Sydow also stated that if a gang member feels disrespected, the gang member responds "immediately and sometimes with [an] overwhelming and unnecessary level of force." According to Sydow, a gang member's show of force was like bringing a firearm to a fistfight.

Ferrell testified that gang members carried guns when they were out to protect gang members from nongang members. Prior to the shooting, Monk Mob members commonly brought guns to parties.

We find the prosecutor's comments differ from those found objectionable in *Bains v. Cambra* (9th Cir. 2000) 204 F.3d 964 (*Bains*), relied on by defendants. In *Bains*, the defendant was charged with the murder of his sister's ex-husband after the husband divorced the sister. At trial, the evidence established that all three were members of the Sikh faith and that a husband's unilateral divorce could provide a motive for violent revenge by the wife's family. (*Id.* at pp. 967, 970.) The prosecutor commented that, " 'If you do certain conduct with respect to a Sikh person's female family member, look out. You can expect violence' " (*id*. at p. 970), and in the defendant's mind, " '[t]he laws in

36

the United States [are] not what we're talking about. We're playing by Sikh rules' " (*id.* at p. 975).

The Ninth Circuit Court of Appeals found these comments constituted misconduct, stereotyping Sikhs and encouraging the jury to draw inflammatory inferences about the group. The comments stereotyped all Sikhs, including the defendant, as predisposed to violence when a family member was dishonored and incapable of abiding by the law. (*Bains*, *supra*, 204 F.3d at p. 975.) None of the comments in the present case rise to the level of stereotyping the defendant or inflaming the jury found objectionable in *Bains*. Instead, the prosecutor reiterated statements made by the gang expert and defendants' fellow gang members regarding gang culture and guns.

Given the evidence before the jury, the prosecutor's comments on gang culture vis-à-vis guns were neither speculative nor irrational and did not "demonize" defendants or constitute inflammatory, improper argument.

## V. CRIMINAL STREET GANG ENHANCEMENT

Carmicle contends the evidence is insufficient to support the primary activities element of the criminal street gang enhancement, an argument in which Fields joins. The jury found defendants committed counts one, two, four, and five for the benefit of the Monk Mob criminal street gang under section 186.22, subdivision (b)(1). Defendants argue no evidence shows the Monk Mob gang had as one of its primary activities one of the statutorily enumerated crimes.

We review a challenge to the sufficiency of the evidence to support an enhancement allegation by considering the entire record to determine whether it discloses substantial evidence. Substantial evidence is evidence that is reasonable, credible, and of solid value through which a reasonable trier of fact could find the allegation true beyond a reasonable doubt. (*People v. Gurule* (2002) 28 Cal.4th 557, 630.)

One of the requirements to support a criminal street gang enhancement is that the group has as one of its primary activities one or more of the crimes specified in section 186.22, subdivision (e). "Primary activities" refers to the group's chief or principal occupation, not an occasional act. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) Proof of such primary activities can consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute or a gang expert's opinion concerning primary activities based on his personal encounters with gang members, investigation of gang crimes, and other relevant information. (*Id.* at p. 324.)

At trial, Detective Sydow, who was very familiar with the gang, its history, and its membership, testified that the Monk Mob gang's primary activities in 2008 were "robberies, often being strong arm robberies, occasionally being armed robberies. Their other primary activities were the sales of drugs, largely being Ecstasy and marijuana, and also residential burglaries, and, to a lesser degree, commercial burglaries." According to Sydow, other primary Monk Mob activities included assaults with deadly weapons and drive-by shootings, as well as pimping activity.

Sydow also testified as to specific offenses by individual Monk Mob members. These incidents included a shooting in 2007 and another shooting in 2008, both of which began as fistfights and ended in gunfire. Ferrell, a member of the Monk Mob, corroborated Sydow's testimony. Ferrell testified that at a gang meeting, Monk Mob members discussed how the members would get money by selling drugs, committing robberies, and engaging in other illegal activities. The night of the shooting, Carmicle sold drugs at an earlier party and tried to sell drugs at Razaghzadeh's party.

Defendants fault Sydow's testimony for being "too vague" to allow the jury to find the Monk Mob engaged in enumerated primary activities proven beyond a reasonable doubt. According to defendants, the "evidence showed only a few spates of

38

criminal activity committed by several of its members during the dozen years of the gang's existence. This does not satisfy the 'primary activities' element."

Defendants concede that Sydow cited several convictions of Monk Mob members for drug sales since the gang's formation. Nonetheless, they argue, those convictions are insufficient to establish gang members " 'consistently and repeatedly' " committed the crimes enumerated in the gang statute.

However, we review the entire record, which includes, along with the drug convictions, Ferrell's testimony, Carmicle's actions the night of the shooting, and Sydow's familiarity with Monk Mob history.[4] Based on the record before us, substantial evidence established that the Monk Mob engaged in the primary activities enumerated in section 186.22.

## VI. INSTRUCTION ON VOLUNTARY INTOXICATION

Both Carmicle and Fields argue that CALCRIM No. 625 improperly precluded the jury from considering Carmicle's voluntary intoxication in determining whether Fields acted in imperfect self-defense. In addition, Carmicle contends the instruction precluded the jury from considering whether his voluntary intoxication prevented him from forming the mental state necessary for aiding and abetting.

**Background**

The court instructed with CALCRIM No. 6.25: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation.

---

[4] Evidence of past or present criminal activity listed in section 186.22, subdivision (e) is admissible to establish the primary activities element.

"A person is *voluntarily intoxicated* if he becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"You may not consider evidence of voluntary intoxication for any other purpose."

In his motion for a new trial, Carmicle made the same objections to the instruction that he makes on appeal. The trial court rejected these arguments.

The court gave CALCRIM No. 625 because Fields testified to his voluntary intoxication at the time of the crime. The court noted: "The jury rejected this defense as to Fields, and he, as well as Carmicle, was convicted of first degree murder.

"A defendant is entitled to a voluntary intoxication instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the Defendant's . . . actual formation of specific intent. [Citation.]

"Here the voluntary intoxication instruction was unnecessary for the Defendant Carmicle. Carmicle did not testify. Simply, there was no evidence that he was actually intoxicated at the time of the party when the crime occurred. There was no evidence that he was in any way impaired during the crime. There was no evidence establishing the amount of what Carmicle personally ingested, the strength of what he ingested, whether what he may have ingested earlier had worn off, any tolerance based on prior usage, or whether it actually affected the formation of his mental state."

The court then reviewed the evidence of Carmicle's drug usage that night. The court noted Harris's testimony was inconsistent as to whether Carmicle took Ecstasy. Although Fields testified he saw Carmicle take Ecstasy before the party and thought Carmicle was high before the party, he "just, quote, figured, close quote, Carmicle was high at the party." The court considered Harris's testimony speculative. In addition, although Harris testified he took two Ecstasy pills, they did not make him hallucinate. Instead, Harris testified he was able to understand his actions. Both Fields and Harris conceded that, as an illegal drug, any potential effects could vary. No testimony

40

established the quantity or potency of the marijuana Carmicle smoked or the Ecstasy he ingested. The court concluded there was no substantive evidence that Carmicle was voluntarily intoxicated at the time of the murder.

Carmicle's trial counsel did not request any aiding and abetting voluntary intoxication instruction. The court stated: "The instructions were worded in a manner agreed upon by counsel for Defendant Carmicle, as consistent with his tactical decisions." The court also found any alleged instructional error harmless, since the jury rejected the voluntary intoxication defense as to Fields, making it improbable that it would judge Carmicle differently.

**Discussion**

Fields argues CALCRIM No. 625 improperly prevented the jury from considering evidence of his intoxication in order to assess his defense of imperfect self-defense. In Fields's view, the jury could not consider his intoxication in determining whether he actually believed when he fired the gun that he or others were in imminent danger or whether he actually believed the use of deadly force was necessary in order to meet the perceived danger. Carmicle also challenges the court's instruction on voluntary intoxication.

Fields claims CALCRIM No. 625 conflicts with section 22, subdivision (b), which provides: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." According to Fields, since CALCRIM No. 625 does not mention "express malice aforethought" but instead states evidence of voluntary intoxication may be considered on the issue of "intent to kill," the instruction omits the element of unlawfulness and is not a correct statement of the law.

Fields concedes the court in *People v. Turk* (2008) 164 Cal.App.4th 1361 (*Turk*) found CALCRIM No. 625 correctly stated the law on consideration of intoxication

41

evidence. However, Fields contends *Turk* failed to perceive that intent to kill is not the same as intent to unlawfully kill and is therefore wrongly decided.

We are not convinced by defendant's criticisms of *Turk*. In *People v. Saille* (1991) 54 Cal.3d 1103, 1119, the Supreme Court stated that, with the abolition of diminished capacity as a defense, "Intoxication is now relevant only to the extent that it bears on the question of whether the defendant actually had the requisite specific mental state." An instruction relating intoxication to any mental state is therefore "now more like the 'pinpoint' " instructions that "are not required to be given sua sponte." (*Ibid.*)

However, Carmicle argues that, although a trial court has no sua sponte duty to instruct on the relevance of intoxication, if it does so instruct, it must do so correctly. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134.) According to Carmicle, it is reasonably likely the jurors interpreted CALCRIM No. 625 to erroneously preclude consideration of Carmicle's voluntary intoxication on the issue of whether he acted with the specific intent and knowledge necessary for aiding and abetting. Under Carmicle's analysis, CALCRIM No. 625 explicitly forbade considering intoxication evidence for any purpose except whether Carmicle acted with intent to kill or with deliberation and premeditation.

We disagree. As the trial court determined, testimony at trial failed to provide substantial evidence that Carmicle was intoxicated to the extent he could not form the intent to aid and abet Fields in the shooting. Carmicle did not testify, and no testimony by any witness established the amount or strength of any substances he ingested. As for Fields, although he testified he took Ecstasy, his actions leading up to the shooting did not reflect a level of intoxication that would prevent him from forming the intent to kill or deliberation and premeditation.

Nor do we find the court's instructions, even if erroneous, prejudiced either defendant. The court instructed the jury it could consider evidence of voluntary intoxication in deciding intent to kill and premeditation. The jury found the evidence

sufficient to convict both defendants of premeditated murder. In convicting Fields, the jury rejected the theory that Fields actually believed he and his friends were in imminent danger of great bodily harm when he fired into the group and killed Razaghzadeh. In convicting Carmicle, the jury rejected the theory that he lacked the ability to form the specific intent to aid and abet the assault. The insertion of express malice aforethought in conjunction with the voluntary intoxication instructions would not have yielded a different result.

## VII.  FIELDS'S SUPPLEMENTAL BRIEF

Fields filed a supplemental brief challenging aspects of his sentence. Fields contends the section 186.22 enhancements are unlawful under section 1170.1, subdivision (f); the enhancement for the murder count is contrary to section 186.22, subdivision (b)(5); and because of his age, the court's sentence of 45 years plus 100 years to life constitutes cruel and unusual punishment.

**Background**

The court sentenced Fields to 100 years to life in prison, to be served consecutively to a determinate term of 45 years. For count one, murder, he received a sentence of 25 years to life, plus 25 years to life for personally discharging a firearm, causing death, and an additional 10 years for the gang enhancement. (§§ 12022.53, subd. (d), 186.22, subd. (b)(1).) For count two, attempted murder, the court sentenced him to seven years, plus 25 years to life for personally discharging a firearm, causing great bodily injury, and 10 years for the gang enhancement. (§§ 12022.53, subd. (d), 186.22, subd. (b)(1).)

On count four, attempted murder, the court sentenced Fields to two years four months, plus 25 years to life for personally discharging a firearm, causing great bodily injury, and three years four months for the gang enhancement. (§§ 12022.53, subd. (d), 186.22, subd. (b)(1).) Finally, on count five, attempted murder, Fields received two years four months, plus six years eight months for personally discharging a firearm and an

43

additional three years four months for the gang enhancement.  (§§ 12022.53, subd. (c), 186.22, subd. (b)(1).)

**Discussion**

### *Enhancements*

Fields argues the court erred in sentencing him on the murder count and three attempted murder counts.  According to Fields, the section 186.22 enhancements violate section 1170.1, subdivision (f).  In support, Fields cites *People v. Rodriguez* (2009) 47 Cal.4th 501 (*Rodriguez*).

The defendant in *Rodriguez* fired at three people associated with a rival gang.  The jury convicted the defendant of three counts of assault with a firearm and found that he personally used a firearm and committed a felony to benefit a criminal street gang. (*Rodriguez*, *supra*, 47 Cal.4th at pp. 504-505.)  As to each count, the trial court imposed both the firearm enhancement and the gang enhancement.  (*Id.* at pp. 504, 506.)

The Supreme Court found the defendant's sentence violated section 1170.1, subdivision (f), which states:  "When two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. . . ."  The *Rodriguez* court concluded both the firearm enhancement and the gang enhancement punished the defendant for using a firearm.  (*Rodriguez*, *supra*, 47 Cal.4th at pp. 508-509.)

According to the court, the section 12022.5 enhancements punished the defendant for using a firearm during the assaults.  The court discussed the gang enhancements: "Here, defendant became eligible for this 10-year punishment *only* because he 'use[d] a firearm which use [was] charged and proved as provided in . . . Section 12022.5.' (§ 667.5, subd. (c)(8).)  Thus, defendant's firearm use resulted in additional punishment not only under section 12022.5's subdivision (a) (providing for additional punishment for personal use of a firearm) but also under section 186.22's subdivision (b)(1)(C), for

44

committing a violent felony as defined in section 667.5, subdivision (c)(8) (by personal use of firearm) to benefit a criminal street gang." (*Rodriguez, supra*, 47 Cal.4th at p. 509.) Therefore, the court found the imposition of both enhancements violated section 1170.1, subdivision (f) and remanded the case. (*Rodriguez, supra*, 47 Cal.4th at p. 509.)

The court in *Rodriguez* considered the interplay between section 12022.5, subdivision (a) and section 186.22, subdivision (b)(1)(C). In *People v. Robinson* (2012) 208 Cal.App.4th 232 (*Robinson*), the appellate court considered whether a defendant's sentence could be enhanced by both section 186.22, subdivision (b)(1)(C) and section 12022.53. *Robinson* concluded a defendant could be sentenced under both statutes without violating section 1170.1, subdivision (f).

Section 12022.53, subdivision (e)(2) provides: "An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1 shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense." In distinguishing *Rodriguez,* the *Robinson* court noted that section 12022.5, the statute in question in *Rodriguez,* does not contain a provision analogous to section 12022.53, subdivision (e)(2). (*Robinson, supra,* 208 Cal.App.4th at pp. 257-258.)

In addition, *Robinson* cited *People v. Brookfield* (2009) 47 Cal.4th 583, in which the Supreme Court found that under section 12022.53, subdivision (e)(2) a defendant " 'who *personally* uses or discharges a firearm in the commission of a gang-related offense is subject to *both* the increased punishment provided for in section 186.22 *and* the increased punishment provided for in section 12022.53.' " (*Robinson, supra,* 208 Cal.App.4th at p. 258, quoting *Brookfield, supra,* at p. 590.) After considering the legislative history of sections 1170.1, subdivision (f) and 12022.53, *Robinson* held that "treating section 12022.53[, subdivision] (e)(2) as an exception to section 1170.1[,

45

subdivision] (f) is consistent with the Legislature's intent to impose enhanced punishment on those who *personally* use firearms in gang-related felonies." (*Robinson*, s*upra*, 208 Cal.App.4th at p. 261.)

Accordingly, the trial court did not err in sentencing Fields under both section 12022.53 and section 186.22, subdivision (b)(1)(C). A defendant who personally uses or discharges a firearm in the commission of a gang-related offense is subject to both the increased punishment provided for in section 186.22 and the increased punishment provided for in section 12022.53.

### *Murder Sentence*

Fields argues that even if the court could properly impose a section 186.22 enhancement on the murder conviction, the proper enhancement would not be the 10-year term, but rather a requirement that Fields serve a minimum of 15 years before being eligible for parole. The People concede the issue.

The Supreme Court in *People v. Lopez* (2005) 34 Cal.4th 1002 (*Lopez*) held that the provision in the street gang enhancement statute excepting felonies that were punishable by life in prison from imposition of the 10-year enhancement applied to a 25-year-to-life term imposed for first degree murder. The court found the defendant was not subject to the 10-year enhancement under section 186.22, subdivision (b)(1)(C) but instead should be sentenced to the 15-year minimum parole eligibility term in section 186.22, subdivision (b)(5). (*Lopez*, at p. 1011.)

Under *Lopez*, because Fields was sentenced to 25 years to life for murder, he is subject to the 15-year minimum parole eligibility term under section 186.22, subdivision (b)(5). Therefore, we direct that Fields's sentence be modified to delete the 10-year gang enhancement imposed under section 186.22, subdivision (b)(1)(C).

### *Cruel and Unusual Punishment*

Finally, Fields argues his sentence of 45 years plus 100 years to life in prison for crimes committed when he was 17 years old amounts to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

In a recent spate of cases, beginning with *Graham v. Florida* (2010) 560 U.S. 48 [176 L.Ed.2d 825] (*Graham*), followed by *Miller v. Alabama* (2012) 567 U.S. ___ [183 L.Ed.2d 407] (*Miller*), and concluding with *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), the United States and California Supreme Courts explored the constitutional limits of the government's power to punish minors tried as adults. In response to those decisions, the California Legislature enacted Senate Bill No. 260, adding section 3051, which provides minors sentenced to a determinate term of years or a life term an opportunity to prove their rehabilitation and secure release on parole after serving a prescribed term of confinement.

In the wake of these decisions and the resulting legislation, we invited the parties to flesh out the issue, and they have provided differing interpretations of the interaction between section 3051 and the concerns expressed in *Caballero*, *Graham*, and *Miller*. Fields contends that in enacting the legislation, "the Legislature has not relieved the trial courts of the responsibility for individualized sentencing consideration imposed by *Graham* and *Miller*. Nor has it supplanted appellate review of constitutional sentencing claims. Instead, it has created a separate procedure which affords juvenile inmates an opportunity to be considered for parole, by the Board of Parole Hearings, earlier than they would otherwise have been."

The Attorney General presents a contrary interpretation, that in enacting section 3051 "the Legislature endorsed the principles in *Graham* and *Miller* by providing a mechanism whereby the vast majority of juvenile offenders will have a meaningful opportunity for parole well within their lifetimes. For juvenile offenders like Fields, whose sentence is the functional equivalent of LWOP [life without parole], SB 260

47

effectively transforms their sentence to 25 years to life in prison because they will be eligible for parole during their 25th year of incarceration."

The question of whether section 3051 has the effect urged by the Attorney General is pending before the California Supreme Court; ultimately, Fields's arguments will be resolved by the higher court. Therefore, we consider the issue, conscious of the possible ephemerality of our decision.

Three court decisions and a statute provide guidance. In *Graham*, the United States Supreme Court held that the Eighth Amendment prohibits the imposition of a sentence of LWOP on a juvenile for any crime other than homicide. (*Graham*, *supra*, 560 U.S. 48 [176 L.Ed.2d 825].) Subsequently, in *Miller*, the Supreme Court held that states cannot impose mandatory LWOP sentences for juveniles but permitted the imposition of LWOP on juveniles convicted of murder following an "individualized" sentencing that takes into account "how children are different." (*Miller*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 424].)

The *Miller* court specifically noted that mandatory LWOP sentences preclude consideration of a juvenile's chronological age and its hallmark features. These features include "immaturity, impetuosity, and failure to appreciate risks and consequences." (*Miller*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 423].) Mandatory LWOP sentences also prevent the court from taking into account the family and home environments that surround the juvenile, no matter how brutal or dysfunctional. (*Ibid*.) *Miller* did not foreclose the trial court's ability to determine whether it was dealing with a homicide case and the rare juvenile offender whose crimes reflect " 'irreparable corruption.' " (*Id*. at p. 424.)

Instead, *Miller* invalidates LWOP sentences where such a penalty is mandatory and imposed without any consideration of the background or age of the offender. However, a sentence of LWOP resulting from "individualized sentencing" is permissible. Thus, the query becomes what constitutes "individualized sentencing." *Miller* provides

48

guidance: "To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features -- among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him -- and from which he cannot usually extricate himself -- no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth -- for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 423].)

In *Caballero*, our Supreme Court provided its gloss on *Miller*: "The [*Miller*] court requires sentencers in homicide cases 'to take into account how children are different, and how these differences counsel against irrevocably sentencing them to a lifetime in prison.' [Citation.]" (*Caballero*, *supra*, 55 Cal.4th at p. 268, fn. 4.) However, *Caballero* involved not a homicide but a 110-years-to-life sentence imposed on a 16-year-old defendant convicted of attempted murder. *Miller* was cited for the proposition that the *Graham* bar applies to "all *nonhomicide* cases involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of a life without parole sentence . . . ." (*Caballero*, *supra*, 55 Cal.4th at p. 268, italics added.) *Caballero* concluded that "*Graham*'s analysis does not focus on the precise sentence meted out. Instead, as noted above, it holds that a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime. [Citation.]" (*Ibid*.) The court encouraged legislative action: "We urge the Legislature to enact legislation establishing a parole eligibility mechanism that provides a defendant

serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity." (*Id.* at p. 269, fn. 5.)

The Legislature responded and enacted Senate Bill No. 260. The measure finds "that, as stated by the United States Supreme Court in Miller [citation], 'only a relatively small proportion of adolescents' who engage in illegal activity 'develop entrenched patterns of problem behavior,' and that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds,' including 'parts of the brain involved in behavior control.' The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society. The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in People v. Caballero [citation] and the decisions of the United States Supreme Court in Graham [citation], and Miller [citation]." (Sen. Bill No. 260 (2013-2014 Reg. Sess.) ch. 312, § 1, pp. 2-3.)

Section 3051, which codified Senate Bill No. 260, provides an opportunity for a juvenile offender to be released on parole irrespective of the sentence imposed by the trial court by requiring the Board of Parole Hearings to conduct "youth offender parole hearings" (Sen. Bill No. 260, *supra*, § 4, p. 7) to consider the release of juvenile offenders sentenced to prison for specified crimes. It provides for a youth offender parole hearing during the 15th year of incarceration for a prisoner serving a determinate sentence (§ 3051, subd. (b)(1)), a hearing during the 20th year of incarceration for a prisoner serving a life term less than 25 years to life (§ 3051, subd. (b)(2)), and a hearing during the 25th year of incarceration for a prisoner serving a life term of 25 years to life (§ 3051,

50

subd. (b)(3)). Section 3051, subdivision (d) requires the Board of Parole Hearings to "conduct a youth offender parole hearing to consider release." Section 3051, subdivision (f)(1) requires that any psychological evaluations and risk assessment instruments be administered by a licensed psychologist employed by the board and that the evaluations and instruments "take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual."

Here, under section 3051, subdivision (b)(3), any of Fields's four 25-years-to-life sentences can serve as the "controlling offense," and the parole eligibility scheme is based on the sentence for the controlling offense. Therefore, Fields will be eligible for a youth offender parole hearing once he serves one of his 25-years-to-life sentences.

The youth offender parole hearing to which Fields is entitled will provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" as discussed by the United States and California Supreme Courts. (*Graham*, *supra*, 560 U.S. at p. 75 [176 L.Ed.2d at p. 846]; see *Miller*, *supra*, 576 U.S. at p. ___ [183 L.Ed.2d at p. 424]; see also *Caballero*, *supra*, 55 Cal.4th at p. 266.) However, the operative question is whether this legislative remedy corrects the constitutional violation in sentencing alleged by Fields.

Justice Werdegar, who wrote in *Caballero* "that the Legislature is an appropriate body to establish a mechanism to implement *Graham*'s directives for the future" (*Caballero*, *supra*, 55 Cal.4th at p. 273, conc. opn. of Werdegar, J.), also stated that "irrespective of whether the Legislature, in the future, steps in to enact procedures under which juveniles in defendant's position may be resentenced, the trial court in this case must resentence defendant to a term that does not violate his rights. . . . *Graham* does not require defendant be given a parole hearing *sometime* in the future; it prohibits a court from sentencing him to such a term lacking that possibility *at the outset*." (*Ibid.*) No other justice concurred in her views.

51

Fields argues section 3051 does not relieve the trial court of the responsibility for individualized sentencing mandated by *Caballero*, *Graham*, and *Miller*. However, even if we accept Fields's argument that a post facto remedy cannot cure a past constitutional error, here the error has been rendered harmless by the Legislature's action. We are confronted by the practical, and dispositive, fact that the new sentencing hearing Fields urges us to compel cannot provide him any more favorable relief than does the new legislation.

Under California law, Fields faces a mandatory prison sentence of 25 years to life for murder, increased by a mandatory 25 years to life for the gun enhancement. If we remand the case for resentencing as Fields requests, the sentencing court's only discretion would be to order concurrent, rather than consecutive, 50-years-to-life terms, meaning Fields would not be eligible for parole until he had served 50 years in prison. But with the benefit of section 3051, Fields will be eligible for parole after 25 years of incarceration. Even if he is denied parole at his first youth offender parole hearing in 25 years, section 3051 provides for additional hearings. Section 3051, subdivision (g) provides, in part: "If parole is not granted, the board shall set the time for a subsequent youth offender parole hearing in accordance with paragraph (3) of subdivision (b) of Section 3041.5. In exercising its discretion pursuant to paragraph (4) of subdivision (b) and subdivision (d) of section 3041.5, the board shall consider the factors in subdivision (c) of Section 4801."

We conclude that even assuming the trial court's sentencing process failed to comport with the requirements of *Miller*, the violation was rendered harmless with the enactment of section 3051, which affords Fields more favorable relief than any that could be provided by this court.

## DISPOSITION

The case is remanded to the trial court to modify Fields's sentence to delete the 10-year gang enhancement under section 186.22, subdivision (b)(1)(C).  In all other respects, the judgments are affirmed.

                                                            RAYE            , P. J.


I concur:


            MURRAY        , J.

I concur in the majority opinion with the exception of part I, in which I concur in the result, and part VII, from which I respectfully dissent.

# I

### *Natural and Probable Consequences Jury Instruction*

I agree with the majority's conclusion that any error in instructing Carmicle's jury about the natural and probable consequences as it applied to the charge of first degree murder of Patrick Razaghzadeh was harmless beyond a reasonable doubt.

In *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), the California Supreme Court held accomplice liability for first degree premeditated murder cannot be based on the natural and probable consequences doctrine. (*Id.* at pp. 158-159.) The California Supreme Court nonetheless noted, "Aiders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles. [Citation.] Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. [Citation.] Because the mental state component -- consisting of intent and knowledge -- extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder." (*Id.* at pp. 166-167.) For lack of evidence that the jury relied on the alternative theory of defendant directly aiding and abetting a premeditated murder, the *Chiu* court reversed the first degree murder conviction. (*Id.* at pp. 167-168.)

In this case, any instructional error on the application of the natural and probable consequences doctrine to premeditated murder is harmless beyond a reasonable doubt. (See *Chiu, supra*, 59 Cal.4th at p. 167 [holding that "[d]efendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the

1

premeditated murder"].) *Chiu* involved a conviction for only a single criminal act, aiding and abetting a premeditated murder. (*Id.* at p. 160.) By contrast, this case involves Carmicle's conviction of one count of first degree murder and three counts of attempted murder of Kyle Camp-Kelly, Spencer Bell, and Michael White.

The attempted murder convictions necessarily mean the jury found Carmicle intended to directly aid and abet premeditated murder. (See *People v. Banks* (2014) 59 Cal.4th 1113, 1152 [mental element of attempted murder].) The jury's finding that Carmicle handed the gun to Fields with intent to directly aid and abet what turned out to be three attempted murders suffices beyond a reasonable doubt to supply the intent necessary for what turned out to be an actual murder committed in the same volley of bullets. Because Carmicle's attempted murders supply the necessary premeditation to render any instructional error arising from the natural and probable consequence doctrine harmless beyond a reasonable doubt, I would omit, as unnecessary, the discussion of the jury's note regarding knowledge of intent regarding aiding and abetting. Accordingly, I respectfully concur in the result reached in part I of the majority opinion.

## II

### *Life Sentences for Crimes Committed by Minors*

In part VII, the majority holds Fields's sentence of 45 years plus 100 years to life in prison for crimes committed when he was a minor does not constitute cruel and unusual punishment in light of the Legislature's recent enactment of Penal Code section 3051.[1] Section 3051 entitles Fields, after 25 years of incarceration, to a hearing in front of the Board of Parole Hearings where he will have the opportunity to show his "growth and maturity" render him suitable for parole. (§ 3051, subds. (b)(3), (f)(1).)

---

[1]     Undesignated statutory references are to the Penal Code.

Thus, the majority concludes any constitutional error arising at Fields's sentencing is cured by the statutory promise of a future remedy. Because I do not believe section 3051 cures the denial of sentencing rights for minors articulated in recent United States and California Supreme Court decisions, I respectfully dissent.

## A.

### *Life Sentences for Crimes Committed by Minors*

In *Graham v. Florida* (2010) 560 U.S. 48, 81 [130 S.Ct. 2011, 176 L.Ed.2d 825] (*Graham*), the United States Supreme Court announced that the "Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." (560 U.S. at p. 82 [130 S.Ct. at p. 2034].) Two years later, in *Miller v. Alabama* (2012) ___ U.S. ___ [132 S.Ct. 2455] (*Miller*), the Supreme Court declared, " '[j]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered' in assessing his [or her] culpability." (*Id*. at p. ___ [132 S.Ct. at p. 2467], quoting *Eddings v. Oklahoma* (1982) 455 U.S. 104, 116, [102 S.Ct. 869].) The *Miller* court recognized it "imposed a categorical ban on the sentence's use, in a way unprecedented for a term of imprisonment. See [*Graham, supra,*] 130 S.Ct., at 2046 (THOMAS, J., dissenting) ('For the first time in its history, the Court declares an entire class of offenders immune from a noncapital sentence using the categorical approach it previously reserved for death penalty cases alone')." (*Miller, supra*, at p. ___ [132 S.Ct. at pp. 2466-2467].)

Following *Graham* and *Miller*, the California Supreme Court held a 110-year-to-life sentence imposed for three counts of attempted murder committed as a minor constituted cruel and unusual punishment. (*People v. Caballero* (2012) 55 Cal.4th 262,

3

265 (*Caballero*).) As the *Caballero* court explained, "the Eighth Amendment requires the state to afford the juvenile offender a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation,' and that '[a] life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity.' (*Graham, supra*, 560 U.S. at p. ___ [130 S.Ct. at pp. 2029–2030].) The court observed that a life without parole sentence is particularly harsh for a juvenile offender who 'will on average serve more years and a greater percentage of his [or her] life in prison than an adult offender.' (*Id*. at p. ___ [130 S.Ct. at p. 2028].) *Graham* likened a life without parole sentence for nonhomicide offenders to the death penalty itself, given their youth and the prospect that, as the years progress, juveniles can reform their deficiencies and become contributing members of society. (*Ibid*.)" (*Caballero*, *supra*, 55 Cal.4th at p. 266.)

In *Caballero*, the Attorney General argued the 110-year-to-life prison sentence for a minor did not violate the Eighth Amendment even though it was the "functional equivalent to a life without parole term" on grounds no individual component of the defendant's sentence by itself amounted to a life sentence. (*Caballero*, *supra*, 55 Cal.4th at p. 271.) Our Supreme Court rejected the contention because "the purported distinction between a single sentence of life without parole and one of component parts adding up to 110 years to life is unpersuasive." (*Id.* at pp. 271-272.) Thus, the *Caballero* court reversed the sentence and instructed that "the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated

4

maturity and rehabilitation.' " (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269, quoting *Graham*, *supra*, 560 U.S. 43 at p. 74.)

Here, Fields's sentence of 45 years plus 100 years to life in prison constitutes the functional equivalent of a life-without-parole (LWOP) term. (*Caballero*, *supra*, 55 Cal.4th at p. 266 [holding that a sentence of 110 years to life in prison is the functional equivalent to LWOP].) The trial court erred by imposing a sentence that did not undertake the individualized sentencing considerations articulated in *Graham*, *Miller*, and *Caballero*. Consequently, Fields's sentence violates the Eighth Amendment and may stand only if section 3051 somehow cures the constitutional error.

**B.**

***Senate Bill No. 260* (2013-2014 Reg. Sess.) *Does Not Cure the Constitutional Error in Sentencing***

The Legislature responded to *Miller, supra,* __ U.S. __ [132 S.Ct. 2455] and *Caballero, supra,* 5 Cal.4th 262 by passing Senate Bill No. 260 (2013-2014 Reg. Sess.), which became effective on January 1, 2014. The Legislature noted the bill "recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society." (Sen. Bill No. 260, § 1 (2013-2014 Reg. Sess.).) The Legislature declared, "[t]he purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in [*Caballero*] and the decisions of the United States Supreme Court in [*Graham*], and [*Miller*]. It is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and

5

a meaningful opportunity for release established." (Sen. Bill No. 260, § 1 (2013-2014 Reg. Sess.).)

To effectuate the Legislature's intent, Senate Bill No. 260 (2013-2014 Reg. Sess.) added section 3051 to the Penal Code, which requires the Board of Parole Hearings to conduct youth offender parole hearings during the 15th, 20th, or 25th year of incarceration. (§ 3051, subd. (b).) A youthful offender whose sentence is a term of 25 years to life or greater is "eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions." (§ 3051, subd. (b)(3); Sen. Bill No. 260, § 4 (2013-2014 Reg. Sess.).) In conducting youth offender parole hearings under section 3051, the Board of Parole Hearings is required to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c).) If the youthful offender is found suitable for parole by the Board of Parole Hearings, he or she must be released even if the full determinate term originally imposed has not yet been completed. (§ 3046, subd. (c).)

In light of Fields's newly enacted entitlement to a youth offender parole hearing during his 25th year of incarceration, the majority concludes that "even assuming the trial court's sentencing process failed to comport with the requirements of *Miller*, [*supra, ___ U.S. ___* [132 S.Ct. 2455]] the violation was rendered harmless with the enactment of section 3051, which affords Fields more favorable relief than any that could be provided by this court." (Maj. opn. at p. 52.) In *Caballero*, however, the California Supreme Court expressly held: "Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them *at sentencing* of a meaningful opportunity to demonstrate their rehabilitation and fitness to

6

reenter society in the future.  Under *Graham's* nonhomicide ruling, *the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life*, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board."  (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269, italics added.)

Even though Senate Bill No. 260 (2013-2014 Reg. Sess.) provides what may be considered a "safety net" providing a juvenile offender the opportunity for a parole hearing during his or her lifetime, the new legislation does not substitute for the sentencing court's consideration of all individual characteristics of the offender.  In *Miller*, the United States Supreme Court held imposition of punishment for crimes committed as a juvenile constitutes a task "demanding individualized sentencing . . . ."  (*Miller, supra,* ___ U.S. at p. ___ [132 S.Ct. at p. 2467].)  After noting its earlier decisions requiring consideration of the mitigating and aggravating factors unique to each case of sentencing for crimes committed as a minor, the *Miller* court emphasized that, "[o]f special pertinence here, we insisted in these rulings that *a sentencer have the ability to consider the 'mitigating qualities of youth.'* "  (*Id.* at p. ___ [132 S.Ct. 2455, 2467], quoting *Johnson v. Texas* (1993) 509 U.S. 350, 367, italics added.)

Senate Bill No. 260's promise of a future remedy does not cure the constitutional error already committed.  This is because *Miller* and *Caballero* require the individualized considerations for sentencing that pertain to youth be undertaken in the first instance by the sentencing court.  (*Miller*, *supra*, ___ U.S. ___ [132 S.Ct. at p. 2467]; *Caballero*, *supra*, 55 Cal.4th at p. 268-269.)  Regardless of whether the new statutory scheme enacted by Senate Bill No. 260 (2013-2014 Reg. Sess.) may eventually convert a mandatory life sentence to one with possibility of parole, the United States and California

7

Supreme Courts have clearly required the sentencing court to consider the factors of youth and maturity *when selecting the initial punishment*. The statutory promise to have a future parole board review an improperly considered sentence does not cure the constitutional error.

The possibility that Fields will have a board of parole undertake an evaluation 25 years after his sentencing is not a substitute for the trial court's evaluation at sentencing. Although the trial court is not required to articulate the analysis of *Miller, supra,* ___ U.S. __ [132 S.Ct. 2455]*, Graham, supra,* 560 U.S. 48*,* and *Caballero, supra,* 55 Cal.4th 262 as it relates to every youthful offender, each youthful offender is entitled to a sentence that passes muster under the Eighth Amendment. Moreover, a properly imposed sentence by itself can prove instructive in indicating the trial court's conclusions about the youthful offender's level of development, culpability, and other relevant factors. When youthful offenders must ultimately show achievement of sufficient growth and maturity to secure release on parole, they will need to refer back to the circumstances that existed at the commission of the crimes and were apparent to the trial court at sentencing. (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269.) Without a proper evaluation by the trial court, youthful offenders will be deprived of their constitutionally guaranteed evaluation at the time of their sentencing and again when attempting to meet their burden during the much later youth parole hearings. (*Ibid.*) Consequently, we adhere to the guidance of the United States and California Supreme Courts that the sentencing court must engage in the proper evaluation of the appropriate punishment for a youthful offender. (*Miller*, *supra*, ___ U.S. ___ [132 S.Ct. at p. 2467]; *Caballero*, *supra*, 55 Cal.4th at p. 268-269.)

The question of whether remand for resentencing must be ordered in this case is additionally informed by the California Supreme Court's recent examination of constitutionally deficient sentencing for youthful offenders in *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*). *Gutierrez* involved consolidated cases in which two

defendants, Gutierrez and Moffett, each separately committed special circumstance murder while 17 years old.  (*Id.* at p. 1360.)  The trial courts imposed LWOP sentences on each defendant under section 190.5, subdivision (b), which had been construed to create a presumption in favor of LWOP sentences for special circumstance murders committed by 16- and 17-year-old offenders.  (*Ibid.*)  In *Gutierrez*, the California Supreme Court harmonized section 190.5, subdivision (b), with Eighth Amendment protections by holding trial courts have discretion to sentence youthful offenders to serve sentences of 25 years to life or LWOP with no presumption in favor of the LWOP option.  (*Id.* at pp. 1371-1379.)

Because the defendants in *Gutierrez* had been sentenced under the prior, prevailing presumption in favor of LWOP, the Supreme Court held resentencing was required.  (58 Cal.4th at pp. 1361, 1379.)  In so holding, the *Gutierrez* court rejected the Attorney General's argument that the recent enactment of section 1170, subdivision (d)(2), "removes life without parole sentences for juvenile offenders from the ambit of *Miller's* concerns because the statute provides a meaningful opportunity for such offenders to obtain release."  (*Gutierrez, supra,* 58 Cal.4th at p. 1386.)  Section 1170 allows a youthful offender to petition the court to recall the sentence after serving 15 years.  (*Id.* at p. 1384 [noting also that the youthful offender, if not initially successful, may petition again after 20 and 24 years have been served].)  The *Gutierrez* court explained that the United States Supreme Court in "*Graham* spoke of providing juvenile offenders with a 'meaningful opportunity to obtain release' as a constitutionally required alternative to -- not as an after-the-fact corrective for -- '*making the judgment at the outset* that those offenders never will be fit to reenter society.'  (*Graham*, at p. 75 [130 S.Ct. at p. 2011], italics added.)  Likewise, *Miller's* 'cf.' citation to the 'meaningful opportunity' language in *Graham* occurred in the context of prohibiting 'imposition of that harshest prison sentence' on juveniles under a mandatory scheme.  (*Miller*, at p. ___

9

[132 S.Ct. at p. 2469].) Neither *Miller* nor *Graham* indicated that an opportunity to recall a sentence of life without parole 15 to 24 years into the future would somehow make more reliable or justifiable the imposition of that sentence and its underlying judgment of the offender's incorrigibility 'at the outset.' (*Graham*, at p. 75 [130 S.Ct. at p. 2011].) [¶] Indeed, the high court in *Graham* explained that a juvenile offender's subsequent failure to rehabilitate while serving a sentence of life without parole cannot retroactively justify imposition of the sentence in the first instance: 'Even if the State's judgment that Graham was incorrigible were later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate *because that judgment was made at the outset*.' (*Graham, supra*, 560 U.S. at p. 73 [130 S.Ct. at p. 2011], italics added.) By the same logic, it is doubtful that the potential to recall a life without parole sentence based on a future demonstration of rehabilitation can make such a sentence any more valid when it was imposed. If anything, a decision to recall the sentence pursuant to section 1170(d)(2) is a recognition that the initial judgment of incorrigibility underlying the imposition of life without parole turned out to be erroneous. Consistent with *Graham*, *Miller* repeatedly made clear that the sentencing authority must address this risk of error by considering how children are different and how those differences counsel against a sentence of life without parole '*before* imposing a particular penalty.' (*Miller, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2471], italics added; see *id*. at pp. ___, [132 S.Ct. at pp. 2469, 2475].)" (*Gutierrez, supra*, at pp. 1386-1387.) In short, the California Supreme Court recognized a statutory promise of future correction of a presently unconstitutional sentence does not alleviate the need to remand for resentencing that comports with the Eighth Amendment.

Consequently, as to Fields, I would reverse and remand "the case to the trial court with directions to resentence defendant to a term that does not violate his constitutional rights, that is, a sentence that, although undoubtedly lengthy, provides him with a

'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'  (*Graham*, 560 U.S. at p. ___ [130 S.Ct. at p. 2030].)"  (*Caballero*, *supra*, 55 Cal.4th at p. 273 [Werdegar, J., conc.].)

                                    <u>          HOCH          </u>, J.